IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| Justin D. Reed, | ) | CASE NO. 2:11–cv–153 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Dr. Richard J. Rodarte, M.D., an individual; | ) | |
| Hammond Clinic, an Indiana business entity; | ) | |
| and Norfolk Southern Corporation, dba | ) | |
| Norfolk Southern Railway, a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

Comes now Plaintiff Justin Reed, and for his causes of action against Defendants Dr. Richard J. Rodarte M.D., Hammond Clinic, and Norfolk Southern Railroad states:

**Nature of Action**

1.      This is an action by Plaintiff Reed against all defendants under Indiana statutes and common law privacy doctrines and provisions, and under Indiana defamation doctrines, arising out of their knowing and unauthorized dissemination of confidential medical information of a highly sensitive type, resulting in harm to Plaintiff's employment, standing in the community, and personal life, and further against Norfolk Southern Railway for violations of Indiana law on the corporate practice of medicine.

**Jurisdiction of the Court**

2.      The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332.

3.      Defendants all do business and have facilities in Northern Indiana.

1

## Parties

4.  At all times material hereto, Plaintiff Reed was and is a Michigan resident, seen and diagnosed in Munster, Indiana.

5.  Defendant Rodarte is a physician in occupational medicine, practicing in Munster, Indiana. Reed worked regularly in northern Indiana and in Chicago's southern metropolitan area.

6.  Defendant Hammond Clinic is a business entity organized in Indiana and doing business in both Hammond and Munster, Indiana.

7.  On information and belief, Defendants Hammond Clinic and Rodarte had a corporate medical practice arrangement with Defendant Norfolk Southern Railway.

8.  Defendant Norfolk Southern Railway ("NS") is a common carrier and employed Reed at the time of the incidents complained of. Its headquarters are in Norfolk, Virginia. Its Medical Department, headed by a physician, controls and directs a network of local clinics and physicians in connection with physical examinations, injuries, and other matters. NS is not a citizen of the State of Indiana.

## Operative Facts

### Facts regarding Justin Reed

9.  On or about April 29, 2009, Plaintiff Reed sustained an apparent work injury while working in Chicago, Illinois, at CP 518 with the work group known as the "103 gang." They were changing out switch ties and using spike mauls, claw bars, 16-lb. sledge hammers, and a hydraulic spiking gun (similar to a jackhammer) to do so. It is very strenuous work: switch ties weigh between 200 and 400 pounds; a hydraulic spiking gun, approximately 80 pounds.

10. At a time between 10:00 a.m. and 11:30 a.m., Reed told his trainee supervisor, Joe (last name unknown), that he was hurt and wanted to go to the hospital. The supervisor asked Reed if he was serious, and was answered in the affirmative. The supervisor told Reed that he would have to wait to go to the hospital while the supervisor made some phone calls.

11. Reed went to sit down in a supervisor's truck and was followed by the supervisor. Reed's cell phone rang, but the supervisor told Reed he could not answer that call. However, when an NS track supervisor named Justin Brooks phoned, Reed was allowed to take the call.

12. Brooks asked Reed if he was really injured, and then said, "If I let you go back to the hotel and rest with pay, do you think it will get any better?" Reed told him, "No, I know what pain is. I worked with kidney stones last year." Brooks tried for ten or fifteen minutes to change Reed's mind about going to the hospital, saying, "You know how this railroad is about their injuries." Brooks was referring to the harsh retaliatory acts NS takes against employees reporting injuries.

13. Supervisor "Joe" was directed by NS' Assistant Division Engineer (ADE) Lloyd Brewer that Reed must continue to wait until Bart Iskra, the assistant supervisor, arrived. Once Iskra showed up, he spent two hours on the phone talking to other employees. Reed told Iskra he needed to go to the hospital immediately and Iskra replied that they would go "after I finish a few things." Finally, Ralph Widener, the track inspector and a BMWED union representative, told Reed the railroad had no choice but to let him get medical care. He directed Reed to tell Iskra, "Let's go, it's been too long," and accompanied him to insist on that with Iskra.

14. Reed told Iskra that he wanted to go to the closest hospital in Chicago. Iskra told Reed that upon Brewer's direct orders, "You [Reed] have to go the Hammond Clinic in Indiana."

3

Reed was not given a choice, and it took another forty-five minutes from the time they left the Chicago location at CP 518 to get to the Hammond Clinic.

15. At the Hammond Clinic, Reed and Iskra met Gus Aranis, an NS track supervisor from northern Indiana. Aranis asked Reed numerous inappropriate personal questions, very obviously attempting to intimidate Reed into admitting that he was lying and not really injured, or not injured at work.

16. In the middle of the afternoon, Iskra and Reed went inside the Hammond Clinic at 7905 Calumet Avenue in Munster, Indiana. Iskra and Reed filled out accident reports while Reed was waiting for medical care.

17. Railroad company officers wanted to go into the examining room with Reed and Dr. Rodarte, but Reed requested and finally insisted that the officers be excluded from the examining room, on the basis that medical matters should be private. Dr. Rodarte reluctantly agreed to exclude the officials.

18. Once Reed was finally able to see Dr. Richard Rodarte, Reed told him the pain was in his abdominal area all the way down to his groin. Rodarte checked Reed for hernias and said there were none, and then sent Reed for an ultrasound. All tests came back normal. Dr. Rodarte determined that Reed's pain was caused by a sexually transmitted disease and not by any work-related incident, and made a definitive diagnosis of epididymitis, an infection caused by a sexually transmitted disease. Dr. Rodarte wrote gratuitously wrote down, next to the misdiagnosis, the words "not work related".

19. Dr. Rodarte made three attempts to prescribe some kind of narcotic for this diagnosed infection, even though he knew Reed's medical history and knew, or should have

known, that Reed was not able at the time to take narcotics. Dr. Rodarte told Reed to consult his personal physician when he reached home.

20. After Reed was diagnosed with a nonwork-related injury, ADE Brewer called Supervisor Aranis and had Aranis fax all the paperwork from the Hammond Clinic to Brewer's office in Illinois. Brewer then phoned Iskra and asked to speak with Reed, telling him Reed needed to "sign off" on the injury, because if he didn't, "It would take a very long time for [Reed] to get back to work" and his "big bosses" would "look down on" him even if he did get back to work.

21. Reed, intimidated and aware that the company doctor had diagnosed the injury as nonwork-related, "signed off" on the injury and faxed the form to Brewer's office. Following the instructions of the officials, he filled out a written paper stating that the medical problem he had was not caused by anything in his work at NS.

22. At no time did Reed sign a release pertaining to any of his medical information, and no signed medical release for information was ever obtained by Dr. Rodarte or the Hammond Clinic. The Clinic had a standard form for that purpose, and gave Reed a copy along with other paperwork. The release, however, is neither signed nor dated by Reed.

23. Reed asked the railroad officials who had accompanied him what he should do about going back to work. They told him he could go back the next day, April 30, 2009. The gang was working in South Chicago and had been billeted by NS at a motel nearby.

24. Because he was in serious pain and highly skeptical of Dr. Rodarte's diagnosis, Reed returned to his home in order to see his personal physician and get a second opinion. On or about April 30, 2009, he went to the emergency room at Bronson Methodist Hospital, 601 John Street, Kalamazoo, Michigan. There he had blood work and an ultrasound done. Both came

back normal. The E.R. doctor, Dr. Wesley L. Rigot, diagnosed Reed with myofascial strain. Dr. Rigot determined that there were absolutely no signs of an infection caused by a sexually transmitted disease.

25. Reed obtained further medical workups, and standard laboratory and other tests performed in order to confirm or rule out Dr. Rodarte's diagnosis of epididymitis caused by a sexually transmitted infection. All of these clearly indicated that Reed did not have epididymitis. Tests and visits to Reed's physician in Michigan determined that while Reed's symptoms were idiopathic (i.e., without any identifiable cause), they may have been due to a work-related strain to the abdominal and groin areas caused by heavy lifting.

26. Despite the absence of a signed medical release by Reed authorizing the clinic to release information to the employer or anyone else, Dr. Rodarte and the Hammond Clinic conveyed that information verbally to the Norfolk Southern officials who accompanied Reed to the clinic, and put it in a medical record given to the officials. The diagnosis of an STD was communicated by Norfolk Southern officials to other officials and to hourly workers, and the diagnosis became commonly known among workers in the work area affected. Reed's father, also a track worker, was so informed, and jokes, with nicknames, circulated widely on the railroad, causing Reed and his father significant personal distress. Epididymitis is a venereal disease, associated with frequent and varying sexual partners to a greater degree than many other such diseases. The unfounded personal information was of a harmful character.

27. Both Hammond Clinic and Dr. Rodarte were aware of their duty to obtain written authorization from Reed before releasing any medical information to any other person or entity, including the referring employer. Neither obtained written authorization from Reed for the release of any medical information to Norfolk Southern Railway.

28. Reed was seen for the purposes of diagnosis and treatment of his condition as necessary, in the context of a one-time-only office visit, for determination of physical fitness for duty—that is, whether the condition or injury made it medically advisable that Reed not return to work for any period of time—and for determination of whether the condition was work-related.

Facts regarding Norfolk Southern's Corporate Practice of Medicine

29. NS has a corporate medical department directed from the railroad's main offices in Norfolk, Virginia.

30. The corporate medical department is granted full authority to determine all medical issues that the railroad deems related to employment, or which NS wishes to know about or control, regardless of the relation to employment. The department controls, and/or has a significant role as to, *inter alia*, fitness for duty of applicants and regular employees; whether any given employee is entitled to sick leave, disability, or other medical status; whether a given course of treatment is appropriate; and the design and contracting of medical screening and surveillance, information-gathering, and many related tasks.

31. NS' Medical Department sets policy and practices for its employees, agents, and contractors, and for the entire railroad to the extent the employees and supervisors of the various departments (operating, engineering, car and locomotive, etc.) interact with the medical department and must carry out its instructions and requests regarding medical care and medical and employment status of all employees.

32. The medical department maintains a network of contract physicians and clinics for examinations and reports. On information and belief, these contractors report to NS and are subject to instruction and directions from NS' medical department.

33. There have been many other examples in Indiana of egregious medical mistreatment by NS contract physicians and officials. In one case, track worker W.S. in northern Indiana suffered a knee injury in attempting to get out of a very large rail-mounted truck and lower himself to the ground from that height. He was in severe pain and urgently requested to go the hospital, as he had difficulty ambulating.

34. There were hospitals and clinics available within less than a ten-minute drive, since the injury occurred in or near an Indiana city of medium size. Despite this, NS officials insisted on driving him to the other side of the state (over two hours) to see a doctor designated by the medical department of NS. The physician definitively diagnosed a congenital knee deformity or condition, which he opined was the sole cause of the discomfort, opined it was not at all serious, and instructed W.S. that he was perfectly fit to go back to work the following day.

35. The next morning, W.S.'s wife, appalled at his condition and severe pain, arranged for him to be seen immediately at an emergency room. His x-rays from that examination were sent to an orthopedist, who ordered an MRI and (based thereupon) performed emergency surgery the same day on the severely injured knee. The treating doctor told W.S. and his wife that the diagnosis and work status information from the preceding evening was incorrect and irresponsible.

36. In another Indiana situation, an employee was struck in the head by a medium load on a crane, and was knocked to the ground. He was dizzy and unsteady following the blow, and in considerable pain, with visible wounds. NS officials refused to take him in for medical care, insisting that it was not a reportable incident and he should stay on the worksite. As in many instances, NS officials were making medical decisions.

37. A coworker called the victim's wife, who was an RN. She demanded to speak with the supervisor and told the official her husband obviously had suffered a concussion, perhaps significant, perhaps not, but absolutely requiring a neurologic workup immediately. This was finally done. She demanded he be taken to the nearest facility, a very short distance away. There are many such anecdotal incidents in other states.

38. On information and belief, NS selects, retains, contracts with, and maintains or discontinues associations with medical providers on the basis of each provider's perceived or apparent willingness to produce medical assessments and diagnoses that, *inter alia*, allegedly injured employees have not actually suffered work related injuries but rather suffer from nonwork-related conditions if they suffer at all; that there is actually nothing wrong with the employee, or that the injury is extremely minor, if there is one; that the employee has been off work an inordinate amount of time relative to the injury; that the employee appears to be exaggerating; that the employee's history is inconsistent with any injury; that the employee does not need further medical care, or only minimal medical care, and many similar variations of these themes.

39. On information and belief, NS' Medical Department, in its ongoing communications, directly or indirectly conveys information, attitudes, or policies to the contracted providers as to whether NS is satisfied with their work and its consistency with the preferences stated in the preceding paragraph. On information and belief, NS has written policies and instructions for such physicians, most of which are considered highly sensitive by NS and not for review by anyone, as well as other, more significant verbal policies and preferences, which are conveyed indirectly based on the content.

9

40.     On information and belief, in enforcing its preferences and policies with regard to medical assessment, care and treatment of its employees, NS goes to questionable lengths to ensure that the initial assessment is done by a physician who has been vetted by NS' medical department and approved for inclusion in the NS network of such physicians who are subject to NS policies. In this regard, as in the case at hand, NS directs its officials in the field to take employees reporting injury to a clinic or physician designated by the NS medical department regardless of the distance and delay in medical care and assessment this may entail and, it appears, regardless of the nature of the injury and the need for particular expertise in assessing and treating the same. (Thus, in the specific instances cited above, the worker with the knee injury, despite severe complaints, was sent to a general practitioner in solo practice with no immediate capacity to do anything beyond taking x–rays of unknown quality.)

41.     On information and belief, in the patterns, practices, and intentional acts already cited, and in the instances cited in the following paragraphs of delay and ignoring or overruling orders and directions of treating physicians, NS engages in corporate medical activity, which directly and indirectly controls or at least influences medical judgments, assessments, diagnoses, treatment options, medical management, ability to return to work, and other significant aspects of medical care.

42.     On information and belief, NS as a corporation has medical judgments made in the field by supervisors, at headquarters by intermediate medical employees such as nurses or other non-physicians, and by the company surgeon or company medical director, who is not licensed or authorized to practice in Indiana, Illinois, or any but one or two of the twenty-two states in which NS operates.

43. On information and belief, in violation of employees' privacy rights, as in this case, NS often requires supervisors to accompany employees to the examining room, and does not instruct or fails to adequately instruct supervisors on medical privacy requirements, specifically in regard to particularly sensitive medical information such as drug use or treatment, alcohol use or treatment, mental health conditions and treatment, and sexually transmitted diseases or treatment.

## Causes of Action

1. Reed represents that these facts state a claim under common law privacy doctrine, because the facts alleged establish that (a) incorrect private information was divulged to persons and entities who had no legitimate right to it in the absence of a signed authorization, (b) it was done in a manner that was coercive and oppressive, (c) it included information that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities, (d) the information was divulged to a large public, namely, all the officials and track workers in the metropolitan Chicago and northern Indiana areas (probably 200 or more), and (d) it was divulged to particular publics with special relationships (employer–employee, family, and coworker) to the plaintiff. Reed had a legitimate expectation of privacy in regard to this medical information and the medical records, and a heightened degree of expectation of privacy on account of the very sensitive and personal nature of the incorrect information.

2. Reed represents that the facts alleged state a claim for defamation, and specifically defamation *per se*, in that the verbal and written communications at issue impute a loathsome disease—venereal diseases have historically been so regarded—and sexual misconduct, because STDs automatically imply, to most citizens, irresponsible promiscuity. Furthermore, the imputation was defamatory and was published to a specific public of particular importance to

Plaintiff with reckless indifference toward where it could go, and any harm it could do. Plaintiff suffered harm from it economically, emotionally, and in employment and personal family contexts.

3. Reed represents that the facts alleged state a cause of action under Indiana doctrines on the corporate practice of medicine. The diagnosis, whether it was medically unfounded, the result of a desire to please NS, or under influence from NS' Medical Department as to desired outcomes, or any combination of these, was in violation of Indiana law on the corporate practice of medicine.

4. For these wrongs, Reed requests all compensation and other relief, including declaratory relief, allowable at law for the harms inflicted upon him, as well as costs, attorney fees, and any other relief, in an amount greater than $100,000.

5. Reed does not assert a cause of action in the present civil case for medical negligence or medical malpractices, and does not claim any damage or other relief based on those theories in this action.

6. Reed does not assert a cause of action in the present civil case for his closely related dismissal in 2010, and does not claim any damage or other relief based thereupon, although the dismissal may be referred to herein as additional information.

7. Plaintiff Reed demands trial by jury.

DATED: October 19, 2011

                              JUSTIN REED
                              Plaintiff

*/s/ Charles A. Collins*

| | |
|---|---|
| Richard A. Miller (#9359–45) | *Charles A. Collins* (MN #0017954) |
| Mitchell A. Peters (#6560–45) | Charles A. Collins, P.A. |
| Miller Fisher Law, LLC | 410 Labor and Professional Center |
| 8927 Broadway | 411 Main Street |
| Merrillville, Indiana 46410 | St. Paul, Minnesota 5102 |
| Telephone: (219) 769-0783 | Telephone: (651) 225-1125 |
| Facsimile: (219) 769-0786 | Facsimile: (651) 225-1153 |
| ram@millerfisherlaw.com | chas@qwestoffice.net |
| <map@millerfisherlaw.com> | |

                              ATTORNEYS FOR PLAINTIFF